[No. 43646-5-I. Division One. November 8, 1999.]

SIMBURG, KETTER, SHEPPARD & PURDY, L.L.P., *Respondent*, v. MORTON E. OLSHAN, ET AL., *Appellants*.

*Howard P. Pruzan* (of *Miracle, Pruzan, Pruzan & Baker*), for appellants.

438

*Robert Baronsky* (of *Eisenhower & Carlson*), for respondent.

WEBSTER, J. — Respondent law firm sued Appellants for unpaid attorney fees claiming they entered into an accord. Appellants appeal the summary judgment order granting unpaid attorney fees to Respondent. They claim they did not enter into the accord with full revelation as required between attorney and client. We agree. Therefore, we reverse the grant of summary judgment.

## FACTS

On March 6, 1991, Morton Olshan sent a letter and a $1,000 check as a retainer to Melvyn Simburg for representation in defending a lawsuit filed against him, his wife, and his companies, Olshan Enterprises, Inc., and Nation-Wide Sports Publications, Inc. (Appellants). In his retainer letter, Olshan acknowledged the possibility of having the lawsuit dismissed for lack of jurisdiction, presumably because he resided in California. (A former consultant to Olshan, who worked for nine years in Washington, brought the lawsuit in King County Superior Court.) On April 22, 1991, Simburg filed a motion to dismiss the complaint for lack of personal jurisdiction and defective service of process. Judge Ricardo S. Martinez denied the motion to dismiss at a motions hearing on May 1, 1991. The next day Simburg wrote to Olshan:

> While this is not the result we expected, the Court [sic] left open the possibility that the suit might be dismissed on a motion for forum non conveniens (or "inconvenient forum"), but would consider doing so only in a separate motion. Also after preliminary discovery we could renew our Motion to Dismiss

for Lack of Jurisdiction if the discovery facts will support the motion.

Clerk's Papers (CP) at 369.

After much pretrial activity, Simburg made one more motion to dismiss for lack of personal jurisdiction that Judge George A. Finkle denied without prejudice. Upon hearing the judge's oral decision on jurisdiction, Simburg addressed the court:

> Your Honor, before we turn to the next issue, the Court does have discretion in a situation like this to allow the defendant to have their expenses of attending trial in Washington defrayed somewhat by the plaintiffs, and we'd [sic] request that the plaintiffs pay defendant's [sic] expenses attending trial and bringing witnesses to trial.

CP at 409-10. Judge Finkle did not preclude Simburg's suggestion on costs but said he probably would consider it if the defendants prevailed at trial. CP at 410.

The defendants did not prevail at the three-week jury trial in November 1992. Simburg, however, obtained a directed verdict dismissing Olshan and his wife, personally, but not his companies. Following posttrial motions, Simburg filed a notice of appeal on behalf of Olshan's companies. The case never reached the Court of Appeals because Olshan's companies settled at $230,000.

In May 1993, Olshan received his final bill from Simburg with an outstanding fee balance of $163,861.46 including costs. At the time of settlement, Simburg says his firm already had received about $200,000 in fees plus costs ($50,000) over the course of the two-year litigation. On June 1, 1993, Olshan wrote to Simburg: "I would appreciate your combing through our invoices to double-check where time and charges might be reappraised." CP at 30.

A little over a week later, on June 10, 1993, Simburg wrote back acknowledging the high amount of time spent but said the statements "fairly reflect" the work done. CP at 36. Simburg claimed that since the court denied the motion to dismiss for lack of jurisdiction, there were additional

expenses because witnesses and documents were in California while the trial took place in Washington. CP at 37. He explained the rest of the billing statements:

> Approximately $50,000 of the total charges represented disbursements that were out-of-pocket costs, not legal fees. Those disbursements included depositions, expert witness fees, travel and communications, and trial preparation materials. These costs also were kept as low as possible, including using discounted air fares and inexpensive hotels or my brother's house in Los Angeles. In addition, we also found it most efficient to use Gay Gerl, a contract paralegal. Over $40,000 of the legal fees were for her services.

CP at 37. And, as a "courtesy," he offered to reduce the then remaining balance (about $153,861) by $20,000. CP at 38.

Olshan replied, acknowledging "the long hours" Simburg and his firm worked on his case and how frustrated he was about not being able to afford to settle the debt. CP at 40-41. He said he had opened a line of credit with his bank and did not give Christmas bonuses to his employees—both for the first time. CP at 41. He gave Simburg two options: 1) He could pay the Simburg firm $75,000 within 60 days to settle the debt; or 2) he could issue a note for the entire balance due (about $153,862) with monthly payments of $2,000 or more, when possible. CP at 41. Two weeks later, Simburg accepted the second option and added nearly a $24,000 reduction in the promissory note he drafted for an even balance of $130,000. CP at 43-46.

Simburg's subsequent letter a month later reveals that the promissory note he drafted upset Olshan by including a 12 percent interest rate and an acceleration clause. CP at 45, 48. In the subsequent letter, dated July 27, 1993, Simburg agreed to Olshan's original proposal for paying the full balance over time: "As we discussed, you will be paying off the $153,862 with payments of $2,000 a month or more." CP at 48. This time, there was no promissory note attached to the letter, nor interest charged to the payments. CP at 48.

On July 30, 1993, Olshan wrote back: "I appreciate your memo confirming our arrangement to pay off the balance."

CP at 50. The record is silent for 18 months. Presumably, he paid $2,000 per month during that period.

Olshan then wrote to Simburg on March 13, 1995, complaining about the case having been tried in Washington along with his resulting legal expenses and demanded that they settle the debt after he paid a total of $300,000 to Simburg's firm. CP at 52. Simburg wrote back a week later empathizing with him but reminding him of the "no interest payment plan" as well as the $14,500 reduction made in November 1993 and then offered an additional 15 percent discount if Olshan paid in full by June 30, 1995. CP at 54-55. Olshan promptly replied, insisting on $300,000 as the total in fees to Simburg. CP at 57-58. After an exchange of a few more letters, they both refused to compromise.

In July 1997, Simburg's firm (Respondent) filed suit in King County Superior Court. On October 18, 1998, Judge Jeffrey M. Ramsdell granted summary judgment in favor of Simburg's firm and awarded the principal balance due in the amount of $102,893.50 plus interest and taxable costs.

## STANDARD OF REVIEW

Under CR 56, a grant of summary judgment is proper only when there is no genuine issue as to any material fact. In reviewing a summary judgment order, the appellate court evaluates the matter de novo and considers the facts submitted and all reasonable inferences from those facts in the light most favorable to the nonmoving party. *See Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). Affidavits must be made on personal knowledge and must set forth facts evidentiary in nature. *See Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 359, 753 P.2d 517 (1988). Ultimate facts, conclusions of fact, or conclusory statements of fact are insufficient to raise a question of fact. *See id.* at 359-60.

## DISCUSSION

### I. FULL REVELATION

 Appellants claim that Respondent law firm did not make a full revelation of its billing practices before entering into an accord on unpaid fees. An accord and satisfaction requires (1) a bona fide dispute, (2) an agreement to settle that dispute, and (3) performance of that agreement. *See Perez v. Pappas*, 98 Wn.2d 835, 843, 659 P.2d 475 (1983). In addition, when a fiduciary claims accord and satisfaction with a principal, there is a fourth requirement: Evidence of an express agreement made upon full revelation. *See id.*; *Ward v. Richards & Rossano, Inc.*, 51 Wn. App. 423, 429, 754 P.2d 120 (1988); *Gleason v. Metro. Mortgage Co.*, 15 Wn. App. 481, 498, 551 P.2d 147 (1976).

In *Perez*, an attorney and client orally agreed to a 35 percent contingent fee in a personal injury suit. 98 Wn.2d at 837. Upon a favorable structured settlement, the attorney failed to submit to his client a full accounting that reduced the settlement to a present cash value figure. *See id.* at 838. The attorney and client agreed that, rather than 35 percent, the attorney would take $350,000 and pay all fees due the client's former lawyers who worked on the case. *See id.* About six months later, another attorney referred the client to an economist who calculated that the attorney's fee substantially exceeded 35 percent of the actual present cash value of the settlement. *See id.* The attorney agreed to pay $37,500 plus interest to the client based on calculations arrived at between his economist and the client's economist after some compromises. *See id.* No written document evidenced this agreement, but the client did accept the money. *See id.* at 839. Also, the trial judge found believable the attorney's testimony that the client was satisfied with the agreement and found not credible the client's testimony that he was never happy with the fee. *See id.* The Washington Supreme Court noted that it was not until five months after the agreement that the client wrote to the attorney asking for more money. *See id.* at 844.

According to the Supreme Court, the attorney breached his fiduciary duties in renegotiating the fee upward to $350,000 at the time of settlement without full disclosure and a written accounting. *See id.* at 839. Despite the breach in fiduciary duties, however, the Supreme Court wrote there was a later express agreement made upon full revelation—the payment of $37,500 plus interest as calculated by opposing economists. *See id.* at 844. Therefore, the client's acceptance of the $37,500 plus interest constituted an accord and satisfaction. *See id.* at 845.

*Richards & Rossano* also involved a disputed contingent fee agreement. 51 Wn. App. at 425. In that case, the client agreed to pay her attorneys "40% of any and all amounts recovered in any manner." *Id.* Two days after the jury awarded $1,100,000, the attorneys renegotiated a new agreement raising the fee to 50 percent in the event of an appeal. *See id.* at 426. On appeal, this court affirmed the judgment. *See id.* at 427 (citing *Klink v. G.D. Searle & Co.*, 26 Wn. App. 951, 614 P.2d 701 (1980)). The attorneys then retained 50 percent of the award as fees. *See Richards & Rossano*, 51 Wn. App. at 427.

Six years after entering into the 50 percent contingency agreement, the client filed a complaint contesting the validity of that agreement. *See id.* The Court of Appeals found genuine issues of material fact as to whether that agreement constituted an accord. *See id.* at 430. According to the court, the original 40 percent agreement "expressly covered representation 'for all purposes' and the contingent fee for 'amounts recovered in any manner.'" *Id.* at 431. The attorneys knew or should have known that these phrases would be construed to include appellate work but renegotiated the new 50 percent agreement, anyway. *See id.* In addition, had the client retained another firm on appeal, the attorneys would have been entitled only proportionally to reasonable compensation for services rendered. *See id.* at 431 n.5. The Court of Appeals held that a reasonable person could conclude that the attorneys did not make a full

revelation of the law or of potential economic consequences to the attorneys if they did not represent the client on appeal. *See id.*

Appellants argue that the Simburg law firm did not make a full revelation before entering an accord because the billing statements did not disclose: 1) the hourly billing rates for each attorney and staff person; 2) any changes to those hourly billing rates; 3) the minimum billing increment allegedly charged; 4) excessive billings; and 5) the specific attorneys and staff persons who performed services. In addition, Appellants claim there was not full revelation concerning Simburg's personal participation in arguing the motion to dismiss for lack of jurisdiction and his decision not to make a motion to dismiss for forum non conveniens. Respondents contend there was full revelation of all applicable material facts necessary to enter the accord and that Appellants' claims to the contrary are merely conclusory.

A. Hourly Rates

The billing statements submitted by the Simburg firm to Appellants show the month and day of the billable activity, a brief description of the billable activity, the billing code of the attorney or staff person billing the time, the amount of time billed to the tenth of an hour, itemized disbursements, and the total remaining balance due. CP at 193-344. As Appellants assert, the billing statements do not show the hourly rates for each attorney and staff person, but merely the *total* services billed in each statement. *See id.* Since the billing statements do not contain the hourly rates for each attorney and staff person, any changes to those rates may arise without notice to the client. *See id.*; *Severson & Werson v. Bolinger*, 235 Cal. App. 3d 1569, 1 Cal. Rptr. 2d 531, 533 (1991). Respondent claims that there was an oral agreement that Olshan would pay the firm's standard hourly rates plus the costs of litigation. Although the billing statements itemized the disbursements or costs, the only written statement of the hourly rates appears in a letter from Respondent's counsel after the alleged accord, pre-

sumably for discovery purposes in this case. CP at 361. In that letter, Respondent admits to changing the hourly rates slightly for one attorney during the representation of Appellants. *See id.* Therefore, unlike *Perez* which involved calculations by opposing economists, Appellants had no reasonable way to evaluate Respondent's billing statements, particularly for changes in hourly rates as well as possible mistakes or excesses in billing.

▮ In addition, attorney fee agreements that violate the Rules of Professional Conduct (RPC) are against public policy and are unenforceable by the courts. *Barr v. Day*, 124 Wn.2d 318, 331, 879 P.2d 912 (1994) (citing *Belli v. Shaw*, 98 Wn.2d 569, 578, 657 P.2d 315 (1983)). RPC 1.5(b) requires an attorney to communicate the basis or rate of the fee, in writing, upon request by the client. Comments to the Model Rules of Professional Conduct suggest furnishing the client with a customary fee schedule or a memorandum setting forth the basis or rate of the fee. MODEL RULES OF PROF'L CONDUCT R. 1.5 cmt., *reprinted in* CTR. FOR PROF'L RESPONSIBILITY, AM. BAR ASS'N, A LEGISLATIVE HISTORY: THE DEVELOPMENT OF THE ABA MODEL RULES OF PROFESSIONAL CONDUCT, 1982-1998, at 35 (1999). Professional misconduct in billing attorney fees may be grounds for denying attorney fees. *See Ross v. Scannell*, 97 Wn.2d 598, 610, 647 P.2d 1004 (1982) (Supreme Court remanded to trial court to consider illegal or excessive fees and other charges of unethical conduct). It is within the trial court's discretion to decide what impact, if any, lawyer misconduct will have on a claim for attorney fees. *Kelly v. Foster*, 62 Wn. App. 150, 156, 813 P.2d 598 (1991) (breach of fiduciary duty did not mandate disgorgement of attorney fees). In *Perez*, the Supreme Court found there had been full revelation to support an accord for attorney fees despite the attorney's breach of fiduciary duty. 98 Wn.2d at 844.

▮▮ We find that there is an issue of fact as to whether Simburg sufficiently communicated the basis or rate of its fees as required by RPC 1.5(b). Olshan requested a reappraisal of the billings before entering the alleged accord.

Simburg's reply did not communicate the basis of its fee by explaining its hourly rates but gave only general total figures charged by his paralegal and for disbursements, with no breakdown of attorney charges whatsoever. *Perez* and *Richards & Rossano* involved contingent fees instead of hourly rates. Nevertheless, the clients in both cases had full revelation of the percentage rate charged (even if wrongfully charged as in *Richards & Rossano*). Here, there is no record that Olshan had any notice of the various hourly rates charged by each attorney and staff person at the Simburg firm. Therefore, viewing the facts and reasonable inferences in the light most favorable to Appellants, a reasonable person could conclude that the Simburg firm did not make a full revelation of its billing practices before entering into an accord for unpaid fees with Appellants. The finder of fact must determine whether there was full revelation or an RPC violation in this case.

B. Full Revelation of Other Facts

Appellants' other claims that Respondent had a secret minimum billing increment of 0.3 hours and did not always name specific attorneys and staff persons leading to possible "initial switching" for higher billings are merely conclusory and do not raise genuine issues of material fact. *See Grimwood*, 110 Wn.2d at 359-60. Likewise, the extent of Simburg's participation in arguing the motion to dismiss for lack of jurisdiction does not raise genuine issues of material fact regarding full revelation. In any case, the record shows that Simburg filed at least two motions to dismiss for lack of jurisdiction and personally signed the orders denying the motions. CP at 20, 404, 428, 477-78.

We find, however, that Simburg's decision not to make a motion to dismiss for forum non conveniens is an issue for the trial court. Nevertheless, we note the record that reveals Simburg pleaded with the court to have his client's expenses of attending trial in Washington defrayed. CP at 409. It is up to the trial court to decide what effect, if any, potential attorney fees had on the decision not to seek the motion.

## II. Discovery Rule

Respondent raises the issue of whether an expert's opinion, rendered five years after an accord for attorney fees, concerning legal malpractice and breach of fiduciary duties, constitutes facts to support Appellants' defense to the fee accord. RCW 4.16.080(3) imposes a three year statute of limitations on legal malpractice actions. This court has ruled that RCW 4.16.080 governs a claim against an attorney for breach of fiduciary duty. *See Meryhew v. Gillingham*, 77 Wn. App. 752, 755, 893 P.2d 692 (1995) (estate beneficiary's claim against attorney for breach of fiduciary duty governed by three-year attorney malpractice statute of limitations rather than the probate statute of limitations). The statute of limitations for legal malpractice does not begin to run until the client discovers, or in the exercise of reasonable diligence should have discovered the facts that give rise to his cause of action ("discovery rule"). *See Peters v. Simmons*, 87 Wn.2d 400, 406, 552 P.2d 1053 (1976); *Quinn v. Connelly*, 63 Wn. App. 733, 736, 821 P.2d 1256 (1992). If an attorney's errors or omissions occur during the course of litigation, as a matter of law, a client is deemed to possess knowledge of all the facts that give rise to his cause of action upon entry of judgment. *See Richardson v. Denend*, 59 Wn. App. 92, 96-97, 795 P.2d 1192 (1990).

Appellants claim breach of fiduciary duties as a defense to Respondent's right to recover unpaid balance of fees. Respondent argues that the discovery rule above should apply when a client claims breach of fiduciary duty as a defense. Respondent quotes *Richardson* to support applying the discovery rule:

> Were we to conclude otherwise and adopt the position urged by Richardson [the client], we would be ruling that the statute of limitations is tolled until such time as a dissatisfied client obtains other legal counsel or engages in independent legal research to determine the propriety of the actions of his or her former counsel.

59 Wn. App. at 98.

██ ██ Generally, rules that apply to a client's action for damages based on legal malpractice also apply when used as a defense. *See* 2 RONALD E. MALLEN & JEFFREY M. SMITH, LEGAL MALPRACTICE § 14.26 (4th ed. 1996). The discovery rule, however, is not a substantive rule of law. Allowing the discovery rule to apply to legal malpractice defenses would allow an attorney to wait until the statute of limitations has run before pursuing recovery of his fees. By running the statute of limitations, the attorney may preclude the client from raising a legal malpractice defense to a claim for undeserved fees. The statute of limitations and its discovery rule do not bar, by necessity, a defense of legal malpractice and breach of fiduciary duties to an accord for attorney fees. Therefore, an expert's opinion, rendered five years after an accord for attorney fees, may constitute facts to support a defense to the fee accord.

We reverse the grant of summary judgment and remand the matter to the trial court for further proceedings consistent with this opinion.

BECKER, A.C.J., and COLEMAN, J., concur.

After modification, further reconsideration denied January 12, 2000.

Review granted at 141 Wn.2d 1001 (2000).